# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-00435-SCT

*BRANDON Q. GALES a/k/a BRANDON GALES*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 02/26/2013 |
| TRIAL JUDGE: | HON. RICHARD A. SMITH |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PHILLIP BROADHEAD |
| | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | STAN PERKINS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| | JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/09/2014 |
| FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     The instant matter is before the Court on appeal filed by Brandon Q. Gales against the State of Mississippi.  Gales was convicted in the Washington County Circuit Court of armed robbery and conspiracy to commit armed robbery with sentences of life imprisonment and five years, respectively.  Gales appealed, raising three issues.  While the trial court

committed error, such errors are harmless, and the remaining issues lack merit. Thus, the Court affirms the judgment of the trial court, albeit on different grounds.

## FACTS AND PROCEDURAL HISTORY

¶2.     On December 19, 2011, at about 10:00 p.m., Abdulhakim Weber was in the process of closing his convenience store, the Hyatt Food Mart, for the night. As an employee was about to lock the front door, two black males masked with white t-shirts came into the store. One of the intruders had a pistol and yelled "nobody move" before firing a shot into the ceiling. The shooter took the money that Weber had been counting at the register, while the shooter's partner took money from Weber's pockets. The shooter then demanded a pack of cigarettes before both robbers fled the scene. Weber's employee called 911.

¶3.     The store was equipped with twelve security cameras, which captured the quick exchange. The video shows two black males, wearing white t-shirts as masks, entering the store. The shooter wore a black hoodie, light blue jeans, and brown casual shoes. The shooter's partner wore a black sweatshirt, gray pants, and black and gray shoes.

¶4.     Within minutes of the 911 call, officers arrived at the store and viewed the surveillance footage. Officer Jeremy Arendale described the fugitives to dispatch, which issued a "be on the look out" description. The description depicted a black male with a blue shirt, black pants, and a white hoodie and did not describe the suspect's footwear. Soon after hearing the description, Officer Tabari Thomas spotted a young black male, later identified as Brandon Gales, running roughly five blocks from the Hyatt Food Mart. According to Officer Thomas, Gales was running but attempted to make it seem like he was walking upon

2

noticing the police presence. Officer Thomas stopped Gales and asked him why he was out of breath. Gales responded that he had just left a gambling house.

¶5.     Officer Thomas then conducted a ***Terry***[1] pat-down of Gales. While Officer Thomas did not find a weapon on Gales, he felt a bulge in Gales's back pocket. According to his testimony, Officer Thomas either asked Gales to "let him see what was in his pocket" or Gales voluntarily emptied his pockets, showing him money that Gales said he had won gambling. Officer Thomas asked dispatch for another description of the suspects. Dispatch responded, describing an individual with a black hoodie, light jeans, and brown casual shoes. Gales was not wearing a black hoodie, but instead a gray, long-sleeved shirt; however, he was wearing light jeans and brown casual shoes. Officer Thomas noted that Gales seemed suspicious, as he was out of breath and wearing light clothes for a December night. Because Gales partially matched the description of one of the robbers, Officer Thomas handcuffed and detained Gales for further investigation and soon after drove him to the crime scene.

¶6.     Arriving at the Hyatt Food Mart, Officer Thomas told Officer Arendale that he had detained a person of interest. Officer Arendale spoke with Gales and photographed the money in Gales's pockets. There are some discrepancies in the record as to what exactly happened next. According to Officer Arendale's recount, he went back into the store and asked Weber how much money was stolen and in what denominations. Officer Arendale returned to Gales, took the money from his pockets, and proceeded to count the money, which Officer Arendale testified was consistent with Weber's description. Officer Arendale,

---

[1] ***Terry v. Ohio***, 392 U.S. 1 (1968).

noting a five dollar bill with a red stamp on it, went back to Weber and asked him if there was anything unusual about any of the bills. Weber proceeded to describe a five dollar bill with a red stamp on it that he had received from the bank.

¶7. According to Weber's recount, after the police detained the suspect, Officer Arendale immediately brought the money inside the store and placed it on the counter. Officer Arendale asked Weber if he knew any of the serial numbers, and, after viewing the bills, Weber recognized the bill with the stamp on it as one that he had acquired through regular business and not from a bank. Gales was placed under arrest and brought to the police station once the police connected him to the bill with the red stamp.

¶8. At the station, officers swabbed Gales's hands for gunshot residue. The swabs were sent to the Mississippi Crime Lab, where forensic scientist Chad Suggs analyzed them for the presence of gunshot residue. Suggs found only a particle indicative of gunshot residue on the back of Gales's left hand; however, he was unable to "identify it as gunshot residue to the exclusion of all other environmental sources."

¶9. The morning after Gales's arrest, officers found a black hoodie and a Smith & Wesson handgun in an alley near North Harvey and Bland Street, near where Gales was detained. The handgun and a spent shell casing found at the crime scene were sent to the crime lab for comparison. Forensic scientist Brian McIntire determined that the bullet fired at the Hyatt Food Mart had been fired from the discovered pistol.

¶10. Gales was indicted for two counts of armed robbery and one count of conspiracy to commit armed robbery. Gales filed a motion to suppress all evidence stemming from his unreasonable search and seizure. A hearing was held on the motion, after which the trial

4

court entered an order denying the motion and finding that Officer Thomas's stop and frisk of Gales was proper under **Terry**. The trial court granted a directed verdict on one count of armed robbery. A jury convicted Gales on the remaining counts of armed robbery and conspiracy, and the trial court sentenced him to life imprisonment and five years, respectively, with the sentences to run concurrently. Gales appealed.

## DISCUSSION

¶11. For the sake of organization, Gales's arguments have been divided into five issues. The first three issues concern alleged improprieties as to the **Terry** stop, Gales's arrest, and the recitation of **Miranda** warnings, respectively, while the remaining two arguments focus on the narration of the surveillance video and whether there was legal and evidentiary sufficiency supporting the verdict.

> **I. Whether the trial court erred by refusing to suppress the fruits of an impermissible stop and an unreasonable warrantless search of Gales, when the stated reason for the stop was to conduct a *Terry* pat-down, but the search and seizure of Gales did not meet the constitutional prerequisites for the police officer's actions.**

¶12. Gales's first issue deals with whether Officer Thomas properly performed a **Terry** stop in detaining Gales. For the sake of clarity, the issue has been subdivided into three parts: (a) the initial **Terry** stop, (b) the **Terry** pat-down, and (c) the continued detainment and search of Gales following the **Terry** stop.

¶13. The Court applies a mixed standard of review to Fourth-Amendment claims. **Eaddy v. State**, 63 So. 3d 1209, 1212 (¶ 11) (Miss. 2011) (citing **Dies v. State**, 926 So. 2d 910, 917 (Miss. 2006)). "Whether probable cause or reasonable suspicion exists is subject to a *de novo* review. But the Court limits the *de novo* review of the trial court's determination to

5

historical facts reviewed under the substantial evidence and clearly erroneous standards." *Id.* (emphasis added) (citations omitted). When reviewing evidentiary rulings made by a trial court, the Court employs an abuse of discretion standard. *Brown v. State*, 965 So. 2d 1023, 1026 (¶ 10) (Miss. 2007) (citing *Peterson v. State*, 671 So. 2d 647, 655 (Miss. 1996), *overruled on other grounds by Caldwell v. State*, 6 So. 3d 1076 (Miss. 2009)). "[The] Court must first determine if the proper legal standards were applied." *Id.* "Where error involves the admission or exclusion of evidence, [the] Court will not reverse unless the error adversely affects a substantial right of a party." *Ladnier v. State*, 878 So. 2d 926, 933 (¶ 27) (Miss. 2004) (quoting *Whitten v. Cox*, 799 So. 2d 1, 13 (Miss. 2000)).

### A. The Initial Stop

¶14.	First, Gales argues that Officer Thomas did not have a "reasonable suspicion" to stop Gales, as Officer Thomas was responding to the initial, inaccurate description, which described a black male wearing a blue shirt, black pants, and a white hoodie. The description also stated that the suspects were headed in the direction of Belle Aire Street; however, Gales was not walking in that direction. It should be noted that in Gales's motion to suppress, which the trial court denied, Gales conceded that "the Greenville Police Department had the right to stop and question the defendant, and even the right to conduct a pat-down for weapons." Accordingly, the issue of whether Officer Thomas had legal grounds to conduct the *Terry* stop of Gales in the first place was conceded and not argued before the trial court. "Failure to raise an issue at trial bars consideration on an appellate level." *Walker v. State*, 913 So. 2d 198, 217 (¶ 49) (Miss. 2005); *see also Johnson v. State*, _ So. 3d _, 2014 WL

6

971542, *4 (¶ 6) (Miss. Mar. 13, 2014). Regardless, the Court will proceed with an analysis of the stop and pat-down.

¶15. In response, the State argues that Gales essentially is attacking Officer Thomas's credibility. Further, the State notes that the trial court sits as the finder of fact at suppression hearings and thus is solely responsible for determining witness credibility and resolving any conflicts in the evidence, citing **Glasper v. State**, 914 So. 2d 708 (Miss. 2005). The State contends that Officer Thomas had a reasonable suspicion to stop Gales because (1) he was spotted minutes after an armed robbery and only about five blocks away from the crime scene; (2) he partially matched the description of one of the robbers; and (3) he was running and appeared nervous.

¶16. "Police officers may detain a person for a brief, investigatory stop consistent with the Fourth Amendment when the officers have 'reasonable suspicion, grounded in specific and articulable facts . . .' that allows the officers to conclude the suspect is wanted in connection with criminal behavior." **Eaddy**, 63 So. 3d at 1213 (¶ 14) (citing **Walker v. State**, 881 So. 2d 820, 826 (Miss. 2004)); *see also* **Terry v. Ohio**, 392 U.S. 1 (1968). Based on the evidence in the record, the trial court in the case *sub judice* did not err in finding that Officer Thomas had formed a reasonable suspicion in his detention of Gales. Gales was in the immediate vicinity of the crime scene soon after the robbery, partially matched the description of one of the robbers, and appeared nervous. Officer Thomas's suspicions were further piqued when Gales, who was wearing casual shoes, stopped running when he noticed Officer Thomas's presence. Based on the above facts, Officer Thomas's actions were grounded in a reasonable suspicion that Gales was connected with the armed robbery.

7

### B. *Officer Thomas's* Terry *Pat-Down*

¶17.     Second, Gales argues that, even assuming Officer Thomas had reasonable suspicion initially to stop Gales, Officer Thomas exceeded the scope of *Terry* by ordering Gales to take money out of his pocket, knowing that it was not a weapon.  Gales argues that such a search violates the "plain feel" doctrine enunciated by the Supreme Court in *Minnesota v. Dickerson*, 508 U.S. 366, 375-76 (1993) ("If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent . . . its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.").  The State argues that Gales misconstrues the record and quotes Officer Thomas's statement at the suppression hearing: "when I felt that bulge in his pocket, I didn't know if it was a knife or something wrapped up in something."  According to the State as well as the trial court's factual findings, Officer Thomas then asked Gales what was in his pocket, and Gales voluntarily pulled the money out, claiming he had just won it gambling.[2]  Because Gales voluntarily showed Officer Thomas the money, Gales no longer had a "reasonable expectation of privacy" as to the money under the Fourth Amendment.  *Katz v. United States*, 389 U.S. 347, 359 (1967) (Harlan, J. concurring).

---

[2]There are some discrepancies as to what Officer Thomas said to Gales to prompt him to remove the money from his pocket.  At the suppression hearing, Officer Thomas stated that he asked Gales what was in his pocket.  Later during the hearing, Officer Thomas seems to say that Gales simply removed the money after the pat-down, without Officer Thomas asking anything.  At trial, Officer Thomas testified that he had seen money hanging out of Gales's pocket, prompting him to ask Gales "Why do you have all this money?"  Gales then produced the money and claimed he won it from gambling.  Regardless of which account is the most accurate, the trial court found, relying on Officer Thomas's testimony at the suppression hearing, that Gales voluntarily had produced the money.

Officer Thomas's suspicions were piqued, resulting in his requesting a fresh description, which was more accurate and partially matched Gales.

¶18.  "The rationale underlying the *Terry* stop is the protection of the officer." *Ellis v. State*, 573 So. 2d 724, 725 (Miss. 1990).  To that effect, the U.S. Supreme Court has said that the search "must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29.  "When an object is soft or does not reasonably resemble a weapon, the *Terry* analysis does not justify removing it from the suspect's clothing and searching it." *Ellis*, 573 So. 2d at 725 (citing 3 W. Lafave, *Search and Seizure* § 9.4(b) (2d ed. 1987)).  It is noteworthy that, unlike in the case *sub judice*, the police officer in *Ellis* testified that he had suspected the object he felt during the *Terry* pat-down to be drugs and did not testify that he was concerned about a concealed weapon.  *Id.*  Additionally, "[s]ince *Terry*, [the U.S. Supreme Court has] held repeatedly that mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *see also United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993).

¶19.  Here, Officer Thomas was pursuing an armed robbery suspect who was last seen brandishing a pistol.  Officer Thomas had reason to believe that Gales might have been armed, necessitating a frisk of his person.  While Officer Thomas did not feel anything that was immediately recognizable as a weapon, he felt a unknown bulge in Gales's pocket, prompting concern for his safety.  Despite his concern, Officer Thomas did not search Gales's pocket but merely asked what was in it.  Gales voluntarily emptied his pockets, showed the money to Officer Thomas, and claimed that he had won it gambling.  Based on

9

these facts, the trial court did not err in finding that Officer Thomas constitutionally performed a *Terry* pat-down.

### C. Gales's Continued Detainment and Officer Arendale's Conduct

¶20.    Gales also argues that his continued detainment after Officer Thomas handcuffed him and Officer Arendale's searches exceeded the scope of *Terry*. Gales alternatively argued at the suppression hearing that he was arrested when Officer Thomas handcuffed him and brought him to the crime scene, and the officers should have *Mirandized*[3] Gales at the point of arrest. In its brief, the State did not respond to the alleged *Terry* violations stemming from Officer Arendale's conduct other than saying that it was "justified and permissible." The State further argues that Officer Thomas's encounter with Gales was a *Terry* stop; thus, Officer Thomas was not required to *Mirandize* Gales as he was not yet under arrest.

¶21.    After the hearing on Gales's motion to suppress, the trial court entered an order denying the motion and finding that Officer Thomas's stop and pat-down of Gales was proper under *Terry*. While the order mentioned that Officer Thomas took Gales to the crime scene, it did not analyze the fact under *Terry*. The order referenced Officer Arendale's taking pictures of the money but failed to mention his emptying Gales's pocket. The order stated that "Officer Jeremy Arendale testified the accused was arrested when a stamped bill was confirmed by the owner to be one of his stolen bills."

¶22.    While the Court agrees with the trial court's order that Officer Thomas's initial stop and pat-down was proper, upon *de novo* review, the trial court erred in restricting its analysis

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

10

to the initial stop and not further analyzing Gales's prolonged detainment and searches by Officer Arendale. The U.S. Supreme Court has stated that *Terry* searches are "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. Officer Thomas already had conducted a proper *Terry* search, concluding that Gales was unarmed and had only money in his pockets. While an additional search may have been justified to further ensure officers' safety, Officer Arendale did not pat-down Gales for weapons but instead took money from his pockets and showed it to Weber, who recognized the stamped bill.

¶23. Officer Thomas's continued detainment of Gales and Officer Arendale's conduct in taking Gales's money are not congruent with *Terry*. Gales was in custody, having been handcuffed and placed in a police cruiser. The officers had ample time to attain a search warrant, which would have made Officer Arendale's actions decisively proper. Regardless, the trial court correctly determined Officer Arendale's actions were "justified and permissible," although potentially under a different rationale, as Gales no longer had a "reasonable expectation of privacy" after he voluntarily showed Officer Thomas his money. *Katz*, 389 U.S. at 360. *See also* *Dies v. State*, 926 So. 2d 910, 918 (¶¶ 23-24) (Miss. 2006). Alternatively, if the officers determined that probable cause existed following Officer Thomas's *Terry* pat-down, the officers could have arrested him at that point, potentially allowing the officers to conduct a search incident to arrest. However, Officer Arendale testified that he did not arrest Gales until after Weber identified the stamped bill. As Gales argues, "if Arendale had probable cause to arrest based on what he learned *following* the

11

search at the Food Mart [that Weber recognized the bill], then clearly he did not have probable cause to search [Gales] when [he] *arrived* at the scene with Thomas."

¶24. The trial court erred in finding that Gales was not arrested until the bill was confirmed by Weber to be one of the stolen bills. When Officer Thomas handcuffed Gales, placed him in his cruiser, and transported him to another location, Gales was "effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that a reasonable person would have believed he was not free to leave." *Florida v. Royer*, 460 U.S. 491, 501-02 (1983) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Because his detainment would qualify as a Fourth Amendment seizure, the arresting officers were required either to attain a search warrant or to find an applicable exception to the warrant requirement in order to search Gales.

¶25. Because Officer Arendale's subsequent searches of Gales prior to his being placed under arrest may have exceeded the scope of *Terry*, we must also analyze whether Gales's arrest and subsequent searches were legally justified.

    **II. Whether, assuming that Gales was arrested when Officer Thomas placed him in his police cruiser, Officer Thomas had probable cause to arrest Gales and Officer Arendale had a proper basis to conduct a warrantless search of Gales's person.**

    *A. Probable Cause*

¶26. Before analyzing whether Officer Arendale's search of Gales was proper, the Court must first determine whether probable cause existed to place Gales under arrest. "Probable cause exists when the facts and circumstances within an officer's knowledge or of which he has reasonable trustworthy information, are sufficient in themselves to justify a man of

average caution in belief that a crime has been committed and that a particular individual has committed it." *Hall v. State*, 455 So. 2d 1303, 1304 (Miss. 1984) (citing *Holland v. State*, 263 So. 2d 566 (Miss. 1972)). The test for probable cause is not reducible to "precise definition or quantification." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision." *Illinois v. Gates*, 462 U.S. 213, 235 (1983). "All [the U.S. Supreme Court has] required is the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Florida v. Harris*, 133 S.Ct. 1050, 1055 (2013) (quoting *Gates*, 462 U.S. at 238, 231)).

¶27. Here, Officer Thomas responded to dispatch's description of armed robbery suspects in the vicinity of the Hyatt Food Mart. While the initial description of the suspect was inaccurate, Officer Thomas noticed a suspicious individual running away from the Hyatt Food Mart. Officer Thomas saw that the man began walking upon noticing police presence. Officer Thomas properly performed a *Terry* stop and pat-down of Gales. While Gales was detained, Officer Thomas noticed that he was sweating, appeared nervous, and was wearing light clothing on a cold December night. Gales voluntarily showed Officer Thomas wads of money, which he claimed he had won gambling. Officer Thomas then asked dispatch to repeat the description of the suspect. Dispatch then had a more accurate description of the suspect, describing an individual with a black hoodie, light blue jeans, and brown casual shoes. Gales matched the description, other than the black hoodie.

13

¶28. Based on the totality of the circumstances, there was more than enough information for a reasonable person to ascertain a fair probability that Gales had just committed the crime in question. Officer Thomas's arrest of Gales was proper.

### B. Exceptions to the Warrant Requirement

¶29. We return to the question of whether Officer Arendale's subsequent search of Gales's pockets and seizure of the money within were proper in the absence of a warrant. "Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' *Agnello v. United States*, 269 U.S. 20, 33, [(1925)] . . . for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police . . . .'" *Katz v. United States*, 389 U.S. 347, 357 (1967) (quoting *Wong Sun v. United States*, 371 U.S. 471, 481-82 (1963)). Searches conducted without a warrant are deemed "per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Id.*

¶30. Despite not having a warrant, Officer Arendale's search of Gales's money did not violate the Fourth Amendment. When Gales voluntarily took out his money and demonstrated it to Officer Thomas, Gales extinguished his "reasonable expectation of privacy" as to the money, just as when illegal contraband is in plain view of a police officer. *Dies v. State*, 926 So. 2d 910, 918 (¶¶ 23-24) (Miss. 2006). As the United States Supreme Court has stated, "once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost . . . ." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983). Alternatively, if Gales did not relinquish his constitutionally protected expectation

of privacy, Officer Arendale's conduct alternatively falls under an exception to the warrant requirement.

¶31. One exception to the warrant requirement is a search incident to arrest, which has been deemed a reasonable search permitted by the Fourth Amendment, even without a search warrant. *Chimel v. California*, 395 U.S. 752 (1969), *overruled in part by Arizona v. Gant*, 556 U.S. 332 (2009). "Under the search incident to arrest scenario, police may search the arrestee's person and 'the area "within his immediate control" –construing that phrase to mean the area within which he might gain possession of a weapon or destructible evidence.'" *United States v. Johnson*, 846 F.2d 279, 281 (5th Cir. 1988) (quoting *Chimel*, 395 U.S. at 763). "Law enforcement officers may, pursuant to a valid arrest, search any container on the person or within his reach." *Johnson*, 846 F.2d at 282. However, the search must be substantially contemporaneous with the arrest. *Id.*

¶32. What qualifies as "substantially contemporaneous" is not controlled by a bright-line test; however, the Fifth Circuit wrote that the "search incident to an arrest must be reasonably contemporaneous to that arrest, but it is a test of reasonableness in light of the particular circumstances that must be applied." *United States v. Maslanka*, 501 F.2d 208, 214 (5th Cir. 1974) (citing *Cooper v. California*, 386 U.S. 58 (1957); *United States v. Preston*, 376 U.S. 364 (1964)); *see also United States v. Edwards*, 415 U.S. 800, 805-06 (1974) (search of defendant's clothes valid though conducted ten hours after arrest); *Curd v. City Court of Judsonia*, 141 F.3d 839, 843 (8th Cir. 1998) (search of purse valid when conducted at police station fifteen minutes after defendant was arrested at home); *United States v. Williams*, 416 F.2d 4 (5th Cir. 1969) (overcoming objections to an arrest-seizure delay of nine hours).

15

¶33. Here, Officer Thomas arrested Gales and immediately brought him to the crime scene. The robbery occurred around 10:00 p.m.; dispatch notified officers of the crime at 10:02; and Officer Thomas stopped Gales at 10:08. It is unclear how long it took Officer Thomas to drive to the crime scene, but the record suggests that it was shortly after he placed Gales in his cruiser. Officers were still investigating the robbery, as evidenced by their presence at the scene. Bringing suspects to the crime scene is not a standard policy of the Greenville Police Department; however, it has occurred in certain situations.

¶34. The record reflects that Officer Arendale's search of Gales's pockets and money qualifies as a search incident to arrest.

### III. Whether the trial court erred by refusing to suppress any statements made by Gales prior to being properly *Mirandized*.

¶35. Next, Gales argues that he was not timely *Mirandized* when he was arrested. The following exchange, discussing when Officer Thomas placed Gales into his police cruiser, was the only time defense counsel questioned a witness – Officer Thomas – concerning *Miranda* at the suppression hearing:

> Q: Beg the Court's indulgence. Did you *Mirandize* him at any point?
> A: Why would I *Mirandize* him if he wasn't placed under arrest by me?
> BY THE COURT: Sir, you can either say yes or no.
> Q: You didn't?
> A: No.
> Q: You didn't *Mirandize* him?
> A: No, because I didn't arrest him.
> Q: I see. I believe that's all.

After the suppression hearing, the trial court entered an order denying the motion to suppress. The order stated that Gales was arrested when the stamped bill was confirmed by Weber to be one of his bills and that Gales then was brought to the police station and read his *Miranda*

16

rights. The order did not cite any law concerning *Miranda*; instead, it focused on the alleged *Terry* violations. The order concluded by stating the following:

> Furthermore, the accused voluntarily removed the item from his back pocket. No action or conduct taken by this officer was "sufficiently deliberate that the exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." The officer's action was good police work, not culpable conduct which must be deterred by the exclusionary rule.

¶36. In his brief, Gales argues that Officer Thomas violated *Miranda* by questioning him about the source of his money. Officer Thomas questioned Gales about the money during the *Terry* stop, which was just before Gales arrested. Gales voluntarily showed Officer Thomas his money, claiming he had won it gambling. Furthermore, nothing in the record indicates that Gales said anything at all after he was placed in Officer Thomas's police cruiser, much less anything incriminating. According to Officer Arendale, Gales voluntarily got out of the police cruiser when brought to the crime scene, but the record is silent as to anything Gales said between the time of arrest and the time he was read his *Miranda* rights.

¶37. The Court has stated that "[e]ven in a case where a violation is demonstrated to have actually occurred, . . . it will be considered harmless error if the whole record demonstrates beyond a reasonable doubt that it was without any substantial prejudicial effect under all of the facts and circumstances of the case." *Cooley v. State*, 391 So. 2d 614, 623 (Miss. 1980) (citing *United States v. Whitaker*, 592 F.2d 826 (5th Cir. 1979)). Here, it is not even clear that there was a *Miranda* violation, and the record does not demonstrate any potential prejudice, because the record does not state what, if anything, Gales said during the period in question. Further, the Court limits its review to the historical facts determined at trial.

17

¶38. The trial court did not abuse its discretion in determining that the exclusionary rule should not apply. As the trial court said in its order, Officers Thomas and Arendale did not deliberately act in such a way that the exclusionary rule would deter such future behavior. The officers were mistaken as to when Gales was arrested; however, nothing in the record suggests Gales said *anything* after being arrested, much less that he was interrogated, which is required for *Miranda* to apply. *Miranda*, 384 U.S. at 439. Therefore, the trial court did not err in refusing to suppress Gales's statements prior to his being *Mirandized*.

¶39. Additionally, Gales did not discuss at trial or in his brief whether Officer Arendale may have violated *Miranda*. The Court consistently has held that alleged *Miranda* violations raised for the first time on appeal are procedurally barred. *Stone v. State*, 94 So. 3d 1078, 1082 (¶ 12) (Miss. 2012); *see also Starr v. State*, 997 So. 2d 262, 266 (¶¶ 8-10) (Miss. Ct. App. 2008). Thus, to the extent that Gales now alleges a *Miranda* violation committed by Officer Arendale, such an argument is, alternatively, procedurally barred. The issue is without merit, or, alternatively, procedurally barred.

**IV. Whether the trial court erred when it failed to sustain Gales's objection to Officer Arendale's narrative of the video surveillance recording when the original video was available in violation of the best evidence rule.**

¶40. In his next issue, Gales argues that Officer Arendale's narration of the surveillance video prior to its being shown to the jury was plain error and violated the best evidence rule. Gales also argues that Officer Arendale's testimony invaded the province of the jury as fact-finders, as he made factual determinations of the events occurring in the video.

18

¶41. The State counters that the best evidence rule provides only that "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Miss. R. Evid. 1003. The State also notes that the best evidence rule pertains only to documentary evidence. *Quinn v. State*, 479 So. 2d 706,709 (Miss. 1985). It is permissible for a witness to narrate video evidence when the narration simply describes what is occurring in the video, but it is impermissible if the witness "attempts to place his own subjective interpretation of events transpiring in the video based on nothing beyond the witness's own inspection of the contents of the videotape." *Pulliam v. State*, 873 So. 2d 124, 127 (¶ 18) (Miss. Ct. App. 2004). However, the State contends that Gales did not assert such an objection at trial; thus the argument is waived. Even if the argument was not waived, the State argues that Officer Arendale's narration consisted only of saying that a man said "good night" and a description of what the robbers were wearing, neither of which is a "subjective interpretation" of what happened.

¶42. The Court "retains the inherent authority to notice error to prevent the manifest miscarriage of justice, despite trial counsel's failure to preserve the error." *Alpha Gulf Coast, Inc. v. Jackson*, 801 So. 2d 709, 727 (¶ 60) (Miss. 2001) (citing *Johnson v. Fargo*, 604 So. 2d 306, 311 (Miss. 1992)). However, "[i]t is well-settled that issues presented for the first time on appeal are procedurally barred from consideration." *Lewis v. Forest Family Practice Clinic, P.A.*, 124 So. 3d 654, 658 (¶ 16) (Miss. 2013).

¶43.   First, the trial court did not err in overruling defense counsel's objection, which was based solely on the best evidence rule. The best evidence rule applies to documentary evidence and is concerned with the authenticity of such evidence. *Quinn*, 479 So. 2d at 709.

> Where proof of a conversation has been of two different kinds, namely *a recording thereof and testimony by witnesses who overheard it*, it has been argued that both the recording and the testimony were best evidence; however, *the courts have not relegated either to a secondary position, but have held that both types of evidence are equally competent primary evidence, and that one is not to be excluded because of the existence of the other.*

*Id.* (quoting 29 Am. Jur. 2d, *Evidence* § 436 (1967)) (emphasis in original). Accordingly, the trial court did not err in overruling defense counsel's objection, and the additional arguments raised by defense counsel – which do not rely on the best evidence rule – are procedurally barred. With that said, we will fully examine defense counsel's underlying argument in search of the alleged plain error.

¶44.   Officer Arendale testified as a lay witness; thus his testimony must first pass the muster of Mississippi Rule of Evidence 701. Rule 701 requires lay witness testimony to be rationally based on the witnesses's perception, helpful to understand his testimony or a fact in issue, and not based on expert knowledge, which is controlled by Rule 702. Miss. R. Evid. 701. The comment to Rule 701 goes on to state, in part:

> The traditional rule regarding lay opinions has been, with some exceptions, to exclude them from evidence. Rule 701 is a departure from the traditional rule. It favors the admission of lay opinions when two considerations are met. The first consideration is the familiar requirement of first-hand knowledge or observation. The second consideration is that the witness's opinion must be helpful in resolving the issues. Rule 701, thus provides flexibility when a witness has difficulty in expressing the witness's thoughts in language which does not reflect an opinion. Rule 701 is based on the recognition that there is often too thin a line between fact and opinion to determine which is which.

20

Miss. R. Evid. 701 cmt.

¶45.  "As the comment to [Rule] 701 explains, there is a two-part prerequisite test for the admissibility of lay witness opinion testimony.  First, the information must assist the trier of fact; and second, the opinion must be based on first-hand knowledge."  *Wells v. State*, 604 So. 2d 271, 278 (Miss. 1992).  There is no substitute for either requirement.  *Id.*; *see also Roberson v. State*, 569 So. 2d 691 (Miss. 1990); *Rose v. State*, 556 So. 2d 728 (Miss. 1990); *Jackson v. State*, 551 So. 2d 132 (Miss. 1989).

¶46.  In the case *sub judice*, Officer Arendale narrated the surveillance footage of the Hyatt Food Mart robbery before it was shown to the jury.  Officer Arendale stated that Justin Jones came to the front door and said "goodnight" to an employee; however, defense counsel did not object to the statements.  Officer Arendale continued, stating that Jones exited, took a few steps, "looked behind him to see if anybody was looking at him," and "fled on foot" out of view of the cameras.  Officer Arendale then stated that, about fifteen seconds later, two black males came from the direction in which Jones had run.  As Officer Arendale began to describe the individuals, defense counsel raised an objection under the best evidence rule, urging the trial court to play the video in place of Officer Arendale's narration.  The trial court overruled the objection, and Officer Arendale described the individuals in the video.  Immediately after Officer Arendale's narration, the trial court played the video for the jury.

¶47.  Officer Arendale was not present at the time of the robbery; thus he did not have first-hand knowledge of the events that took place in the video.  Additionally, the footage lacked audio, so a lay viewer, without having prior information, would not have been able to determine conclusively what was said.  While Officer Arendale did not expressly speculate

21

that Jones may have been casing the joint for the robbers, his testimony seems to imply the possibility. The majority of Officer Arendale's narration consisted of descriptions of events that can be seen clearly in the video. It is noteworthy that Weber and Michael Burchfield, the employee to whom Jones talked prior to the robbery, were both testifying witnesses who had firsthand knowledge of the events that Officer Arendale described.

¶48. The trial court's admission of Officer Arendale's narration may have been improper; however, it did not amount to a miscarriage of justice necessary to constitute a plain error.

> The witness should not tell the jury what they can clearly see for themselves on the tape, as [Officer Arendale] did. It naturally follows that if the jury can clearly see for themselves *and if the witness is in no greater position to relate what is depicted by personal observation of the events*, then his opinion is not one which is helpful to the trier of fact.

*Wells*, 604 So. 2d at 279. Moreover, Officer Arendale testified as to what Jones said to Burchfield, which cannot be heard in the video and was not heard by Officer Arendale; therefore, such testimony necessarily fails the firsthand observation prong of Rule 701.

¶49. However, the trial court's improper admission of Officer Arendale's narration did not amount to a miscarriage of justice. First, defense counsel did not object contemporaneously to the testimony until Officer Arendale began describing the suspects; thus any argument to exclude the testimony prior to the objection is procedurally barred. *Havard v. State*, 928 So. 2d 771, 793 (¶ 39) (Miss. 2006). Even if the arguments were not barred, Officer Arendale's simple description that Jones said "goodnight," has little, if any, bearing on the case at hand. Such a statement is mere exposition to the armed robbery. While Officer Arendale may have implied that Jones may have had some connection with the robbers' immediate, subsequent entry, he did not expressly state an opinion on the matter. Such a statement certainly is less

22

speculative than the description in *Wells*, in which a lay witness, narrating a video of a cashier, speculated as to how the cashier was improperly taking money, which the Court deemed harmless error. *See Wells*, 604 So. 2d at 280. The segment of Officer Arendale's narration which followed defense counsel's objection consisted merely of describing the individuals seen in the video, the recording system itself, and the chain of custody of the video. Therefore, while the trial court improperly admitted Officer Arendale's narration of the video, defense counsel did not raise a proper objection to the narration. Thus, Gales waived the narration argument on appeal, and, regardless, the error does not amount to plain error because it did not result in a miscarriage of justice.

> **IV. Whether the trial court erred when it denied Gales's motion to set aside the jury verdict for legal insufficiency in the prosecution's case or, alternatively, denied Gales a new trial where the verdict was against the overwhelming weight of the evidence.**

¶50. Gales's final argument challenges the legal sufficiency of the verdict and also contends that the verdict was against the overwhelming weight of the evidence. In facing challenges to the legal sufficiency of the evidence, the relevant question for the Court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (¶ 16) (Miss. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)). "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (¶ 18).

23

¶51. Thus, as to the legal sufficiency, Gales argues that no rational trier of fact could have found Gales was one of the robbers. Gales attempts to bolster his argument by demonstrating the circumstantial nature of the case; for example, no one was able to identify Gales positively as one of the robbers, and the description of the robbers was vague and later was modified. Gales also argues Weber's testimony demonstrated his inability to remember the robbery. Additionally, Gales repeats Officer Thomas's statements that there were other black males on nearby streets when he stopped Gales, yet Officer Thomas did not stop those individuals.

¶52. As to the "overwhelming weight of the evidence" argument, Gales iterates that "blue jeans, brown shoes, and a red stamp on a five-dollar bill" are the only items of evidence that convicted him. Gales notes that the police never arrested the co-conspirator and that the black hoodie was not found until the next morning, despite searches that night. Gales also notes that the recovered money was not tested for Weber's fingerprints.

¶53. The State counters by arguing that a rational jury could, and did, convict Gales of the crimes. The Mississippi Crime Lab found a particle indicative of gunshot residue on Gales's hand, and the lab also matched the pistol found the next day with the spent shell casing recovered at the crime scene. Further, the fact that no other conspirators were charged does not preclude the finding of a conspiracy. While Gales was convicted by circumstantial evidence, it was sufficient for a rational juror to make a conclusion of guilt. Arguments regarding the weight of the evidence are to be decided by the jury as the finder of fact. *Moore v. State*, 869 So. 2d 153, 156 (¶ 11) (Miss. Ct. App. 2007).

24

¶54. The verdict was both legally sufficient and not against the overwhelming weight of the evidence. The majority of Gales's stated arguments are factual in nature. "The weight and credibility to be given to a witness's testimony 'are within the sole province of the jury as fact finder.'" *Butler v. State*, 102 So. 3d 260, 268 (¶ 22) (Miss. 2012) (quoting *King v. State*, 798 So. 2d 1258, 1262 (Miss. 2001)). "[The] Court has repeatedly held that 'the jury is the final arbiter of a witness's credibility.'" *Howell v. State*, 860 So. 2d 704, 731 (Miss. 2003) (quoting *Williams v. State*, 794 So. 2d 1019, 1028 (¶ 59) (Miss. 2001)). While much of the evidence supporting Gales's conviction was circumstantial, "[c]irumcumstantial evidence need not exclude every 'possible doubt,' but only every other 'reasonable' hypothesis of innocence." *Campbell v. State*, 798 So. 2d 524, 529 (¶ 13) (Miss. 2002) (quoting *Tolbert v. State*, 407 So. 2d 815, 820 (Miss. 1981)).

¶55. Taking into account the role of the jury as the fact finder, as well as the evidence and testimony elicited by both parties, Gales's verdict was both legally sufficient and not against the overwhelming weight of the evidence.

## CONCLUSION

¶56. The trial court correctly determined that Officer Thomas performed a proper *Terry* stop and pat-down of Gales. However, the trial court erred in its determination that Gales was not arrested until Weber identified the five-dollar bill. Despite such error, upon *de novo* review, Officer Gales had probable cause properly to arrest Gales after Gales voluntarily showed him his money during the *Terry* stop. Further, Officer Arendale properly searched Gales incident to the arrest, allowing him to seize the money and show it to Weber. The trial court correctly determined that the exclusionary rule is not applicable in the case *sub judice*,

25

in part because there was no *Miranda* violation. While the trial court improperly allowed Officer Arendale to narrate the surveillance video prior to its being shown to the jury, the decision of the trial court did not create a miscarriage of justice amounting to plain error. Finally, the correct legal standard was applied to Gales's case, and the verdict is not against the overwhelming weight of the evidence. Therefore, the Court affirms the judgment of the trial court.

¶57. **COUNT II: CONVICTION OF CONSPIRACY TO COMMIT ARMED ROBBERY AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF ARMED ROBBERY AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES SHALL RUN CONCURRENTLY.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.**

**KITCHENS, JUSTICE, DISSENTING:**

¶58. The majority finds the actions of the police justified, reasoning that Gales's apprehension was based on reasonable suspicion to conduct a *Terry* stop and probable cause to arrest. With respect, I disagree. Gales was a black man who happened to be in possession of some cash and who may or may not have been running at the time he was detained. That is not a sufficient basis for the full custodial detention of Gales, at gunpoint, which immediately followed the initial police sighting of him. The Fourth Amendment to the United States Constitution guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or

26

affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

To like effect, Article 3, Section 23, of the Mississippi Constitution guarantees:

The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized.

¶59. In *Terry v. Ohio*, the United States Supreme Court held:

[C]ourts still retain their traditional responsibility to guard against police conduct which is over-bearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. *When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials.* And, of course, our approval of *legitimate and restrained investigative conduct* undertaken on the basis of *ample factual justification* should in no way discourage the employment of other remedies than the exclusionary rule to curtail abuses for which that sanction may prove inappropriate.

*Terry v. Ohio*, 392 U.S. 1, 15, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (emphasis added).

Because the actions of the arresting officer in the case at hand were not predicated upon ample factual justification, I respectfully dissent.

¶60. The Greenville Police Department commenced an investigation following a robbery at the Hyatt Food Mart on December 19, 2011. Investigator Jeremy Arendale, who had been called to the scene, viewed the store's surveillance videos and observed a black male wearing a blue shirt, black pants, and a white hoodie. Arendale conveyed that descriptive information to the police dispatcher who relayed it via police radio. Officer Tabari Thomas, having almost completed his shift for the evening, heard the dispatch and "thought [he] saw somebody running" in the area of Bland Street and North Harvey Street, at least five blocks from the scene of the crime. Thomas testified that he "turned [his police car] back around"

and saw Brandon Gales, a black male who was wearing a long-sleeved gray shirt and blue jeans. Gales allegedly was "trying to walk to try to play it off at that time like he wasn't running." Thomas drew his gun, pointed it at Gales, and approached him, holding Gales at gunpoint from the outset of their encounter. When asked why he was out of breath, Gales reportedly responded that he had just left a gambling house.

¶61. Officer Thomas then patted Gales down. Upon feeling "a little bulge in [Gales's] back pocket," Thomas asked what it was. Gales responded that it was money he had won at the gambling house. Thomas sought an updated description from dispatch, which revealed that the suspect being sought was wearing blue jeans, not black pants as Thomas had thought when he stopped Gales. Thomas then handcuffed Gales, which he testified was "a safety issue for mine and his," and was instructed to take Gales to the scene of the crime. Thomas did not understand that he had, in fact, arrested Gales at that point, but testified that he was detaining him "for further investigation."

¶62. Gales was driven by Officer Thomas to the Hyatt Food Mart. Investigator Arendale testified at the suppression hearing that he pulled a handcuffed Gales from the back seat of the police cruiser, saw "money in his back pocket," and "took some pictures of the money that was in his back pocket and also in his front pocket." Arendale then returned into the store where he had been watching surveillance videos and asked the store clerk, Abdulhakim Weber, about the specific denominations of cash which had been stolen. Arendale returned to the police cruiser and removed the cash from Gales's pocket. Rifling through the cash, Arendale discovered a red stamp on one of the bills, returned inside the Hyatt Food Mart, and asked Weber whether "anything [was] unusual about the cash" taken from his store.

28

According to Arendale, Weber responded that "one of the bills he got from the banker had a red stamp on it." Because the red stamp on the bill seemingly matched the bill taken from Weber's pocket, according to Arendale, Gales was placed under arrest (like Thomas, apparently not appreciating that the handcuffed Gales already had been arrested).

**1. Officer Thomas articulated no reasonable suspicion to justify Gales's initial apprehension.**

¶63. The majority notes Gales's concession in his motion to suppress that "the Greenville Police Department had the right to stop and question the defendant, and even the right to conduct a pat-down for weapons." According to the majority, this acknowledgment forecloses appellate review, since "the issue of whether Officer Thomas had legal grounds to conduct the *Terry* stop of Gales in the first place was conceded and not argued before the trial court." Yet Gales's counsel clearly raised the propriety of the initial stop *ore tenus* during the hearing on the motion to suppress: "[i]n this case, the radio transmissions clearly gave one description. This individual fits another. He is five blocks from the location." Moreover, the trial court's order denying Gales's motion to suppress directly analyzed the initiation of the police stop: "whether the officer's actions were justified *at its inception*, that is, did the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." (Emphasis added.) Further, in his written motion to suppress, Gales stated the following: "[the police] did not have the right to transport [Gales] anywhere, nor did they have the right to conduct a search. The discovery of the money was a result of this violation of the defendant's Fourth Amendment

29

Rights." The question of whether the police *exceeded* the scope of *Terry* thus is squarely before the Court.

¶64.  *Terry* held the following, nothing more:

> We merely hold today that where a police officer observes *unusual conduct* which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a *carefully limited search* of the outer clothing of such persons in an attempt *to discover weapons which might be used to assault him*.

*Terry*, 392 U.S. at 30 (emphasis added).  In that case, one Officer McFadden suspected "two men of 'casing a job, a stick-up'" because they conducted a "casual and oft-repeated reconnaissance of the store window on Huron Road . . . ." *Id.* at 6. He had observed one man leave the other, walk to the storefront, pause to peer into the store window, and return to the other man, who then did the same. *Id.* All in all, "[t]he two men repeated this ritual alternately between five and six times apiece—in all, roughly a dozen trips." *Id.* Later, a third man appeared, conversed with the two men, and then walked off. *Id.* His suspicions aroused, Officer McFadden approached the men and asked their names, fearing that they may have had a gun. *Id.*

¶65.  "When the men 'mumbled something' in response to his inquiries," Officer McFadden ordered the three men to go inside a store and "to face the wall with their hands raised." *Id.* at 7. McFadden then patted Terry down, felt a handgun, removed Terry's overcoat, and located a .38-caliber revolver in Terry's overcoat pocket. *Id.* He also located another revolver

30

on Chilton, the second suspect, but found no weapons on Katz, the third suspect. *Id.* He did not put his hands beneath the outer garments of either Terry or Chilton until he had discovered weapons. *Id.* Finding that McFadden had a reasonable, articulable suspicion "to believe that [Terry] was armed and dangerous," the Supreme Court affirmed Terry's conviction for carrying concealed weapons and concluded that the revolver seized from Terry was "properly admitted in evidence against him." *Id.* at 30.

¶66. Here, both the majority and the trial court concluded that Officer Thomas's initial apprehension of Gales was "grounded in a reasonable suspicion that Gales was connected with the armed robbery." That conclusion was reached notwithstanding that the most Officer Thomas observed was a young man walking—or *maybe* running down a street. This cannot be said to be "unusual conduct," and the officer harkened back to nothing in his experience which led him to conclude from that observation "that criminal activity may be afoot" and that "[Gales] may be armed and presently dangerous." *Id.*

¶67. At the suppression hearing, Thomas testified that the "be-on-the-lookout" radio transmission described a black male wearing a blue shirt, black pants, and a white hoodie heading toward Belle Aire Street. Officer Thomas testified that Gales "had on a gray shirt . . . blue jeans and a brown pair of, I would say Clark Wallabees," and was "walking south." On direct examination, Officer Thomas testified that Gales's pants and shoes matched the description of the suspect associated with the robbery of the Hyatt Food Mart which the officer had heard over his police radio, "everything except for the hoodie." But on cross examination, Officer Thomas admitted that Gales was wearing no blue shirt, no black pants, and no white hoodie. He also conceded that Gales was not heading in the direction of Belle

31

Aire Street. Officer Thomas answered "[t]hat's true" when asked whether he "knew he [Gales] didn't fit any of the description. . . ." Further, Officer Thomas admitted that the initial description included no information regarding the suspect's shoes. Nevertheless, he testified that he "just felt that that was a little suspicious at the time. On the description, as far as the clothing description. . . ."

¶68.   Because the record does not support their assertions, both the majority and the trial court failed to articulate what "reasonable suspicion, grounded in specific and articulable facts," justified the initial stop of Gales. *Eaddy v. State*, 63 So. 3d 1209, 1213 (Miss. 2011) (quoting *Walker v. State*, 881 So. 2d 820, 826 (Miss. 2004)); *Terry*, 392 U.S. at 21 ("the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.") Nevertheless, the majority finds the existence of reasonable suspicion because [they say] "Gales was in the immediate vicinity of the crime scene soon after the robbery, partially matched the description of one of the robbers, and appeared nervous." Additionally, according to the majority, "Officer Thomas's suspicions were further piqued when Gales, who was wearing casual shoes, stopped running when he noticed Officer Thomas's presence."

¶69.   The transcript from the suppression hearing makes clear that Gales was at least *five city blocks* from the crime scene at the time of his apprehension, which cannot be said to be "in the immediate vicinity" of the crime scene. In no respect, save and except his being a black male, did Gales "match the description of one of the robbers" at the time Officer Thomas stopped him; his clothing was starkly distinct from that of the suspect described over the police radio. Further, the appearance of nervousness noted by the majority is

32

understandable. An appearance of nervousness is especially understandable here, in light of Officer Thomas's testimony at trial that he summoned Gales at gunpoint:

> I drew my firearm, pointed it out at him, and I told him to stop, drop any weapons if he had any, and I told him to come to me. He put his hands up. He said he didn't have any weapons, and he started to approach me. *At that time*, he appeared to be very nervous also. . . .

(Emphasis added.)

¶70.    And this was not Brandon Gales's first meeting with the officer; Thomas testified at the suppression hearing that he had arrested Gales only "a week or two earlier" for "public profanity, something like that." Moreover, Officer Thomas's testimony regarding Gales's behavior is not as unequivocal as the majority suggests. At the suppression hearing, Thomas testified that, "I *thought* I saw *somebody* running but I kept on driving so I turned back around and I slowed down, and that's when I saw Brandon Gales. He was kind of trying to walk to try to play it off at that time like he wasn't running." (Emphasis added.) But Officer Thomas contradicted that statement at the suppression hearing by acknowledging that, in his report prepared at the time, he said only that Gales was walking. Even if Gales had been running, then stopped running when he noticed Officer Thomas, and this change of gait had "piqued" Thomas's suspicions, one wonders why those suspicions were not dispelled by the striking differences between the suspect described in the radio transmission and the way that Gales actually looked.

¶71.    It cannot be said that these factors, taken together, "amount to reasonable suspicion." ***U.S. v. Sokolow***, 490 U.S. 1, 9, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). Only Gales's race and gender matched the description of the robbery suspect, and are thus the only

33

characteristics warranting "suspicion" that are substantial in the transcript of the suppression hearing. The majority's conclusion suggests that a *Terry* stop of any black male within approximately one mile of a crime scene would be justified. Consequently, I conclude that Officer Thomas's initial stop of Gales was not justified by any "reasonable suspicion, grounded in specific and articulable facts." Beyond mere speculation regarding Gales's alleged conduct, Officer Thomas articulated no "unusual conduct" on the part of Gales which might have led "him reasonably to conclude in light of his experience that criminal activity may be afoot" and that Gales "may [have] be[en] armed and presently dangerous." *Terry*, 392 U.S. at 30. This simply is not a *Terry* case, and the stop was thus invalid from its outset. Gales's concession that the police had a right to stop him and pat him down for weapons was mistaken and is of no legal significance.

**2.      Gales's continued detention far exceeded the permissible scope of a *Terry* stop.**

¶72.    The majority concedes that "Officer Thomas's continued detention of Gales and Officer Arendale's conduct in taking Gales's money are not congruent with *Terry*" and that "[t]he officers had ample time to attain a search warrant, which would have decisively made Officer Arendale's actions proper." I agree that this, standing alone, is an accurate statement. But, as an initial matter, the majority fails specifically and sufficiently to identify the authority under which the police justified a continued detention of Gales, although it does attempt to answer this inquiry by noting that "Gales no longer had a 'reasonable expectation of privacy' after he voluntarily showed Officer Thomas his money." (citing *Katz v. U.S.*, 389 U.S. 347, 360, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)) (Harlan, J., concurring). I disagree.

34

Powerful thing that it is, cash is not a weapon as contemplated by *Terry*. *See Terry*, 392 U.S. at 29, 30.

¶73.    The majority's reliance on Justice Harlan's concurrence in *Katz* is misplaced. In that case, the FBI, having obtained no warrant, utilized an "electronic listening and recording device" to eavesdrop on the conversations the defendant was having over the telephone in a public, but enclosed, telephone booth. *Katz*, 389 U.S. at 349. The majority of the United States Supreme Court reversed Katz's conviction, holding that, "[w]herever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures." *Id.* at 359. *Katz* is inapposite from the present case, which does not involve a reasonable expectation of privacy in a constitutionally protected area, such as a "home, an office, or a hotel room" or "a telephone booth." *Katz* certainly does not provide justification for the continued detention of Gales following his illegal arrest.

¶74.    *Illinois v. Andreas*, also cited by the majority as support for its argument that Gales's privacy interest in the cash was extinguished when he showed it to Officer Thomas, provides that "[n]o protected privacy interest remains in *contraband* in a container once government officers lawfully have opened that container and *identified its contents as illegal*." *Illinois v. Andreas*, 463 U.S. 765, 771, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983) (emphasis added). In this case, Gales was not in possession of anything that had been identified as contraband. Rather, he merely was in possession of nondescript cash, not specifically identifiable at the time the police observed it as *the* cash stolen from the Hyatt Food Mart. The mere fact that Gales may have brought some cash into plain view did not extinguish his reasonable expectation of privacy in the unique features of the particular cash in his pocket, later brought

35

to light when Gales was searched. Thus, the officers were not justified in examining the cash, as Gales lost no privacy interest in what from all appearances was a legal item.

¶75.    Even if Gales had lost his reasonable expectation of privacy in the money by showing it to Officer Thomas, loss of a reasonable expectation of privacy in some currency does not justify continued detention of a suspect absent legitimate authority for so doing, e.g., probable cause to arrest. Here, the police drove Gales to the scene of a crime, where Weber claimed to recognize a bill marked with some sort of ill-defined red stamp. The majority implicitly takes the position that this event validated the otherwise-deficient arrest of Gales.

¶76.    Once the ostensible *Terry* stop—which never should have occurred in the first place— had revealed that Gales was in possession of no weapons, he should have been free to leave police custody. This Court has held unequivocally that "[a]n investigative stop must be limited in scope . . . . 'Where a detention . . . exceeds the scope of an investigative stop, it approaches a seizure. To justify a search and seizure without a warrant, the state must show probable cause for arrest." *Floyd v. State*, 500 So. 2d 989, 992 (Miss. 1999) (quoting *McCray v. State*, 486 So. 2d 1247, 1250 (Miss. 1986)).The patent illegality of Gales's continued detention, far in excess of the permissible scope of a genuine *Terry* stop, mandates exclusion of the evidence obtained thereby. *See Terry*, 392 U.S. at 29 ("The sole justification of the search . . . is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.")

¶77.    Regardless of whether Gales had a reasonable expectation of privacy in the cash that was in his pocket, the majority implicitly holds here that, because the cash found on Gales

36

was believed to be evidence of an armed robbery, the detention, although unlawful from its inception, was made legitimate by Weber's rather tenuous identification of one of the bills in Gales's pocket as part of the loot from the robbery. Such a rule would turn the exclusionary rule on its head, rendering it wholly impotent. The majority's acquiescence in this retroactive legitimation of illegal police conduct strips the Fourth Amendment of its purpose and its power. Indeed, the United States Supreme Court flatly has rejected the notion "that a search unlawful at its inception may be validated by what it turns up." *Wong Sun v. U.S.*, 371 U.S. 471, 484, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (citing *Byars v. U.S.*, 273 U.S. 28, 47 S. Ct. 248, 71 L. Ed. 520 (1927); *U.S. v. Di Re*, 332 U.S. 581, 68 S. Ct. 222, 228, 92 L. Ed. 210 (1948)). Here, the fact that the cash found on Gales may have been evidence of the armed robbery simply does not justify or legitimize his wrongful apprehension, his continued detention, and the search which led to a police belief that the cash in Gales's possession was, indeed, *the* cash stolen from the Hyatt Food Mart. As in *Wong Sun*, "[a] contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked." *Wong Sun*, 371 U.S. at 484. Here, after arresting Gales with no reasonable suspicion for so doing, Officer Thomas prompted him to remove what was in his pocket. Even if, as the majority insists, Gales removed the cash of his own volition, its production was the direct result of an illegal arrest, and the fruit thus harvested must therefore be suppressed.

3.     **No probable cause justified Gales's arrest.**

¶78. The majority finds that, "[w]hen Officer Thomas handcuffed Gales, placed him into his cruiser, and transported him to another location, Gales was 'effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that a 'reasonable person would have believed he was not free to leave.'" (quoting *Florida v. Royer*, 460 U.S. 491, 501-02 (1983) (quoting *U.S. v. Mendenhall*, 466 U.S. 544, 554 (1980))). I wholeheartedly agree with the majority that "[b]ecause [Gales's] detainment would qualify as a Fourth Amendment seizure, the arresting officers were required to either attain a search warrant or to find an applicable exception to the warrant requirement in order to search Gales."

¶79. The majority is mistaken in holding that the totality of the present circumstances provides "more than enough information for a reasonable person to ascertain a fair probability that Gales had just committed the crime in question." The majority finds that probable cause justified Officer Thomas's arrest of Gales because, "[w]hile the initial description of the suspect was inaccurate, Officer Thomas noticed a suspicious individual running *away from the Hyatt Food Mart*." (Emphasis added.) That Gales was not running toward the Hyatt Food Mart does not necessarily mean that he was running "away" from it. The majority's choice of words implies that Officer Thomas observed Gales actually fleeing the scene. This is wholly unsubstantiated in the record of the suppression hearing, since it is undisputed that Gales was at least five city blocks away from the Hyatt Food Mart at the time of his being arrested by Thomas. Further, the majority states that "Officer Thomas saw that the man began walking upon noticing police presence." With respect, this statement is not supported in the record of the suppression hearing. Thomas equivocated: "I thought I saw

38

somebody running but I kept on driving so I turned back around and I slowed down, and that's when I saw Brandon Gales. He was kind of trying to walk to try to play it off at that time like he wasn't running." On cross examination, however, Officer Thomas acknowledged that, in his written report prepared at the time, he had said that Gales was walking.

¶80.    Struggling to support its contention that Officer Thomas had probable cause to arrest Gales, the majority says, "Officer Thomas noticed that he was sweating, appeared nervous, and was wearing light clothing on a cold December night." No evidence was adduced, either at the suppression hearing or at trial, regarding specifically how cold it was that night. Officer Thomas testified that Gales was wearing a "gray thermal-type shirt, long sleeve," at the time he was apprehended.  The majority continues that "Gales voluntarily showed Officer Thomas wads of money, which he claimed he had won gambling." The colloquy between defense counsel and Officer Thomas at the suppression hearing reads as follows:

Q:  How was the money gotten out of his pants?

A:  He pulled it out himself and said, "This money, I just left the gambling house."

Q:  Well, hold on, let's think about this. You just told me he had a bulge in his pockets and you wouldn't reach in there and get it.

A:  Right. Before I cuff him, he said, "All I got is this money from gambling," and he showed me the money. I was like, "Okay, put it back in your pocket." He put it back in his pocket, and then I detained him as a suspect because the money was balled up. It wasn't like somebody had been gambling and would have folded it.

Q:  Well, that depends. You say, "balled up." In crap games, a lot of times you win a ten and five as you go, and you are grabbing it and balling it up, aren't you?

A:  I don't know, I don't gamble.

Q: Okay, then you really wouldn't know how the money was supposed to be, would you? All right, you determined he had money on him, right?

A: At that time, yes.

¶81. The majority states that "Officer Thomas then asked his dispatcher to repeat the description of the suspect. Dispatch then had a more detailed description of the suspect, describing an individual wearing a black hoodie, light blue jeans, and brown casual shoes." But the record of the suppression hearing substantiates only that a subsequent description identified the suspect as wearing blue jeans. Officer Thomas testified that an updated description "said that they were blue jeans once I had the suspect in custody." The majority recognizes that Gales did not have on a black hoodie. But when asked by defense counsel at what point "were you advised or did you learn that brown shoes were involved," Officer Thomas answered "I can't recall." When asked whether he learned of the brown shoes at the scene of the crime, Officer Thomas replied, "[m]aybe." On redirect, Officer Thomas testified that Officer Jenkins later confirmed that Gales was the suspect because "that's the pants and that's the shoes that the guy had on."

¶82. Although, as observed by the majority, the standard for probable cause is less than "proof beyond a reasonable doubt" or "preponderance of the evidence," ***Illinois v. Gates***, 462 U.S. 213, 235, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), some concreteness and particularity are nevertheless required. *See* ***Roach v. State***, 7 So. 3d 911, 917 (2009) ("probable cause exists when the facts and circumstances within an officer's knowledge are 'sufficient to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it.'") (quoting ***State v. Woods***, 866 So. 2d 422, 426 (Miss.

40

2003) (quoting *Strode v. State*, 231 So. 2d 779, 782 (Miss. 1970))). The United States Supreme Court has held that "'[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003) (quoting *Brinegar v. U.S.*, 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949)). Indeed, "[t]o determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Pringle*, 540 U.S. at 371 (quoting *Ornelas v. U.S.*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996)).

¶83. Mere speculation on the part of Officer Thomas failed to provide him probable cause to arrest Gales, since none of the information Officer Thomas had at that point in time connected Gales with the crime in question. *Cf. Pringle*, 540 U.S. at 371 ("a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine," where "[f]ive glassine baggies of cocaine were behind the back-seat armrest and accessible to all three men," occupants of the car.) I agree with the majority that Gales was arrested when Officer Thomas handcuffed him. But, despite the fact that the arrest was effected then, *it was an invalid arrest*, as no probable cause for an arrest existed and Thomas had no warrant. Officer Thomas's testimony at the suppression hearing regarding Gales's actions, his appearance, and his demeanor was contradictory and inconsistent. Gales was at least five blocks away from the scene of the crime and his attire matched an *updated* description of the suspect in only one particular, his blue jeans, an extremely common item of clothing. It was only after Gales had been arrested that the shoes

41

the suspect had been wearing were identified as being similar to those Gales was wearing. Moreover, the mere fact that Gales had nondescript cash in his possession and that it was balled up in wads was not, in itself, enough for a reasonable officer to connect him to a particular criminal act.

**4.    Gales's arrest does not qualify as a search incident to arrest.**

¶84.    Additionally, the majority makes a quantum leap to arrive at its characterization of Gales's detention as a search incident to a lawful arrest. The United States Supreme Court held that, "[u]nder *Chimel* [*v. California*], police may search incident to arrest only the space within an arrestee's 'immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence.' " *Arizona v. Gant*, 556 U.S. 332, 335, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (quoting *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969) (*overruled on other grounds*)). *Gant* limited the scope of *Chimel* to "reaching distance," and the Supreme Court held that, because Gant was handcuffed and secured at the time his car was searched, he "clearly was not within reaching distance of his car at the time of the search." *Id.* at 344. In the present case, the officer handcuffed Gales, put him into the patrol car, drove him to the scene of the crime, and there searched him.[4] But, as in *Gant*, Gales was secured at the time the search occurred and prior to the search, fully ameliorating any concerns over police safety. The search-incident-to-

---

[4] At one point in its opinion, the majority states that "Gales voluntarily got out of the police cruiser when brought to the crime scene." Considering that Gales was shackled at the time, the assertion that his exit from the police cruiser was voluntary strains credulity. Further, Investigator Arendale testified at the suppression hearing that he pulled Gales out of the police cruiser.

arrest exception to the warrant requirement is thus inapposite from the present circumstances, since "possession of a weapon or destructible evidence" was a practical impossibility for Gales while he was in police custody and handcuffed.

¶85. The majority also erroneously suggests that the present search qualifies as a search incident to arrest because it was "substantially contemporaneous with the arrest" and "Officer Thomas arrested Gales and immediately brought him to the crime scene." The United States Supreme Court has held, however, that:

> The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control. *But these justifications are absent where a search is remote in time or place from the arrest. Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest.*

***Preston v. U.S.***, 376 U.S. 364, 367, 84 S. Ct. 881, 11 L. Ed.2d 777 (1964) (emphasis added) (citing ***Agnello v. U.S.***, 269 U.S. 20, 31, 46 S. Ct. 4, 70 L. Ed.2d 145 (1925)). The Court there held that a search was unreasonable because it was "too remote in time or place to have been made as incidental to the arrest." ***Id.*** at 368. In the present case, a warrantless search was made at the scene of the crime after Gales had been arrested, placed in police custody, and transported across the city. The search of Gales, as in ***Preston***, "is simply not incident to the arrest." ***Id.*** at 367.

5. **The trial court committed reversible error by failing to grant Gales the motion to suppress to which he was entitled.**

¶86. Here, the police *per se* violated Gales's rights by apprehending him in the absence of reasonable suspicion, by arresting him in the absence of probable cause, and by hauling him

to the scene of the crime to be searched in the absence of any legal authority for so doing. Consequently, the evidence obtained as the fruit of this unlawful detention ought to have been excluded. The United States Supreme Court has held that "[w]e need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Wong Sun*, 371 U.S. at 487-88. "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* at 488 (citing Maguire, *Evidence of Guilt*, 221 (1959)). In that case, the police, upon hearing that one "Blackie Toy" sold an ounce of heroin to an informant, arrested a James Wah Toy in the absence of any probable cause that he was the same person sought in the investigation. *Wong Sun*, 371 U.S. at 481. The Supreme Court excluded the narcotics obtained through an illegal arrest because they "were 'come at by the exploitation of that illegality.'" *Id.* at 488. Here, as in *Wong Sun*, the proper remedy is exclusion, since the cash obtained and identified was "come at by exploitation of" the illegality. No mitigating feature serves to purge the primary taint of the illegality of the initial stop, the continued detention, and the search.

¶87.    Likewise, this Court has held that suppression was the appropriate remedy where no "reasonable grounds" justified "the investigatory stop and subsequent search and seizure of evidence from Eaddy." *Eaddy*, 63 So. 3d at 1216. There, police stopped Eaddy's vehicle based on the tip of an informant that a different individual for whom the police had an arrest warrant was in town. *Id.* at 1212. Upon approaching the car, the officer "saw the butt of a gun under the driver's seat, smelled alcohol, and saw an empty liquor bottle." *Id.* A pat-down

search of Eaddy revealed "two pill bottles that each appeared to hold cocaine." ***Id.*** Suppression was the appropriate remedy because the initial apprehension was invalid at inception and the police lacked "reasonable suspicion to make an investigatory stop." ***Id.*** at 1214. In the present case, the initial stop of Gales was invalid because it was not based on reasonable suspicion. The cash in Gales's possession, obtained as fruit of an illegal arrest, should not have been used against him at trial. As in ***Eaddy***, the motion to suppress should have been granted.

6.     **Conclusion**

¶88.    Officer Thomas articulated no reasonable suspicion to justify his initial apprehension of Gales. Gales's continued detention and subsequent search had no basis in law and constituted precisely the sort of unreasonable conduct on the part of the government which is precluded by the Fourth Amendment to the United States Constitution and Article 3, Section 23, of the Mississippi Constitution. I would reverse and remand for a new trial, absent the fruit of the illegal arrest.

**KING, J., JOINS THIS OPINION.**